436 So.2d 987 (1983)
Marcella Sharon RITZ, Individually, by and through Her Legal Guardians, Joseph L. Ritz and Margaret E. Ritz, Appellant,
v.
FLORIDA PATIENT'S COMPENSATION FUND, Florida Physicians Insurance Reciprocal, I. Basil Keller, M.D., and Keller & Sarnowski, M.D., P.A., D/B/a Melbourne Neurologic, Appellees.
No. 81-1180.
District Court of Appeal of Florida, Fifth District.
August 4, 1983.
Rehearing Denied September 2, 1983.
*988 Albert Yurko, Orlando, for appellant.
William B. Wilson of Maguire, Voorhis & Wells, P.A., Orlando, for appellees Florida Physicians Ins., Keller, M.D., Keller & Sarnowski, and Melbourne Neurologic.
James F. Page, Jr., of Gray, Harris & Robinson, P.A., Orlando, for appellee Florida Patient's Compensation Fund.
ORFINGER, Chief Judge.
Marcella Ritz, a mentally retarded woman, suing by and through her parents as legal guardians, appeals from a final judgment in favor of defendants in a malpractice case. Dr. Keller performed brain surgery known as a stereotactic amygdalotomy on Marcella. This is an operation in which electrodes or probes are inserted under x-ray observation through holes drilled in the skull, for the specific purpose of locating and destroying certain brain tissue which controls affected areas of the body. Marcella suffered paresis (slight paralysis or muscle weakness) and loss of voice volume after the surgery. She now has difficulty walking unassisted and can only whisper rather than talk. Her suit contended that the surgery was performed without consent, that any consent given was not informed consent, and that the operation had been negligently performed.
The jury determined the negligence and malpractice issues against Marcella. Although there was contrary evidence presented, we find no basis to overturn its verdict. After Marcella presented her case, the trial court directed a verdict against her on the issues of consent and informed consent, and Marcella contends that this was error warranting reversal.
In reviewing the entry of a directed verdict, we must consider the evidence and all allowable inferences in a light most favorable to the non-moving party. This is the test at the trial level, Levine v. Frank, 311 So.2d 708 (Fla. 3d DCA 1975), as well as the standard of review at the appellate level. McDonald v. McGowan, 402 So.2d 1197 (Fla. 5th DCA 1981). If, in applying this test, no view of the evidence could sustain a verdict for the party moved against, then the directed verdict was properly entered. Reams v. Vaughn, 435 So.2d 879 (Fla. 1983); Tesher & Tesher, P.A. v. Rothfield, 387 So.2d 499 (Fla. 4th DCA 1980). Here, the father signed a consent to surgery. It is contended first that this is insufficient to constitute a valid consent because Marcella is an adult, and secondly, that it was not an informed consent. We will discuss those issues separately.

I. CONSENT BY PARENT
Marcella Ritz was thirty-two years old when this surgery was performed. She has been retarded both mentally and motorwise since birth. Her condition worsened as she grew older and she began to show early signs of a severe form of epilepsy, experiencing both petit mal and grand mal seizures. She was hospitalized on several occasions in an effort to control these seizures with medication. Her parents gave the various consents to treatment. When she reached her mid-twenties in the early 1970's, her condition deteriorated even more. Her seizures became more frequent and her behavior began to be characterized by violence and rages. She came under Dr. Keller's care in 1974, and he attempted to treat her condition conservatively.
There was no conflict about Marcella's inability to understand or give her consent to this surgery. She had an I.Q. between 25 and 30. Her parents had cared for her all her life. They took her to various hospitals and doctors for treatment and signed consent forms for other procedures. They were also the parties who brought Marcella to Dr. Keller for treatment. Marcella's father signed the consent to surgery here.
*989 Appellant argues that consent from Marcella should have been obtained prior to surgery and that her father's consent was of no effect because she was an adult and her father had not then been appointed her legal guardian. There seems to be no controlling precedent on this issue in Florida. The general rule in other jurisdictions is that a parent or next of kin may give an effective consent to medical treatment for a person who is not competent, without the necessity of being appointed a legal guardian. 70 C.J.S. Physicians & Surgeons § 48 (1951); Annot., 25 A.L.R.3d 1439 (1969).
In Farber v. Olkon, 40 Cal.2d 503, 254 P.2d 520 (1953), the California Supreme Court adopted the rule that when an adult child is incompetent and has no legally appointed guardian, the right to consent to medical treatment resides in the parent who has the legal responsibility to maintain such child. In Farber, a father had given his consent to electric shock treatments for his adult incompetent son. Like Marcella, the son became incompetent during his minority and his parents sought treatment for him in many homes, hospitals and sanitariums, and they continued to support him. He was thirty-one years old when he received the treatment complained about in his suit.
Florida courts have recognized the rule that a parent has a continuing legal duty to support an adult incompetent or otherwise dependent child. See Perla v. Perla, 58 So.2d 689 (Fla. 1952); Kern v. Kern, 360 So.2d 482 (Fla. 4th DCA 1978). Section 743.07(2), Florida Statutes (1981), provides that a court may require parental support for a dependent child after it attains the age of majority.[1] Support obligations for adult children mentally or physically disabled have been imposed on parents. See Fagan v. Fagan, 381 So.2d 278 (Fla. 5th DCA 1980); Fincham v. Levin, 155 So.2d 883 (Fla. 1st DCA 1963).
We agree with Farber v. Olkon, and hold that where an adult child is incompetent and has no legally appointed guardian, the right to consent to medical or surgical treatment resides in the parent who has the legal responsibility to maintain and support such child, not only in emergency situations, but where, as here, the treatment is deemed necessary to correct some ailment or disability. Therefore, the consent executed by Marcella's father was not invalid merely because he was not then officially her legal guardian.

II. INFORMED CONSENT
After Marcella came under Dr. Keller's care, the doctor recommended that she be sent to Sunland Center, hoping that the controlled environment and qualified personnel there might be of help. In the more than one-year period she was at Sunland, Marcie's condition worsened; her seizures became more severe and her behavior more uncontrollable. She was described as violent and psychotic. Stereotactic surgery as a potential solution to her problems had been discussed with Marcie's parents from 1974 until 1977. Dr. Keller was reluctant to consider such surgery until he had exhausted other modes of treatment. Both parents testified to Dr. Keller's reluctance to do the surgery until he could determine if medication could control the situation. There is no dispute that the surgery was recommended only after a course of conservative treatment over many years had proved unsuccessful. Neither is there any dispute that the surgery was needed or the proper procedure. Plaintiffs' expert witnesses testified that Marcella was a proper candidate for an amygdalotomy.
The sole point on which appellant urges us to find a jury issue on the question of informed consent is the alleged failure of Dr. Keller to tell the parents that death or paralysis was a potential risk of this surgery. Appellant urges that in the absence of such disclosure by the doctor, the patient or other person giving the consent is not fully informed of the risks and is thus incapable of making an informed decision. While we recognize that informed consent is necessary, we disagree for several reasons that a jury issue was made on that point.
*990 The plaintiff offered no expert evidence as to the nature and extent of the material risks involved in the surgery, nor any expert testimony as to the disclosures of risk and complications which a reasonable surgeon would make under the same or similar circumstances. The operation performed here is neither rare nor unusual. The plaintiff's expert, Dr. Brown, had himself performed more than 150 amygdalotomies, and he referred to other surgeons who had performed many more. The surgery on plaintiff was performed in 1977, and Dr. Brown testified that surgeons had been performing stereotactic surgery for about 28-30 years. He testified that the amygdalotomy was a well-recognized surgical procedure; that the surgery ordinarily produced few side effects, and that paresis and loss of voice were not usual or customary results of this surgery.
The characterization in the dissent of Dr. Keller as "inexperienced" is unfair in the light of the record. He is a trained, experienced neurosurgeon, certified as qualified by the medical specialty board in his field. He has had extensive training in stereotactic surgery, has taught the procedure to other doctors, and had performed more than 80 such procedures before he operated on Marcie. He had not operated on the particular area of the brain, the amygdala, because he never had a patient who needed this specific relief, but had performed other operations in "deep brain" areas using the same equipment and the same surgical techniques as were used here.
In order to submit to a jury the issue of whether and to what extent specific risks of surgery should be disclosed to a patient in securing the patient's informed consent to the procedure, evidence is required as to the nature and extent of the risks and of the standard prevailing in the medical community, i.e., whether a reasonable medical practitioner in the community would make such disclosure under the same or similar circumstances. Ditlow v. Kaplan, 181 So.2d 226 (Fla. 3d DCA 1966). Such evidence was available to plaintiff through her expert who presented evidence on the standard of care with respect to the negligence or malpractice issue and who testified that this standard of care was the same wherever the surgery was performed. He was not asked, however, what the standard was with regard to disclosures of risks so that an informed consent could be given.[2]
Mr. Ritz signed a consent specifically authorizing the performance of a bilateral amygdalotomy, not just a general consent to do anything thought necessary. The form he signed, among other things, says:
2. The nature and purpose of the operation, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantee or assurance has been made to me [sic] the results that may be obtained.
* * * * * *
I CERTIFY THAT I HAVE READ AND FULLY UNDERSTAND THE ABOVE CONSENT TO OPERATE, THAT THE EXPLANATIONS THEREIN REFERRED TO WERE MADE AND THAT ALL BLANKS OR STATEMENTS REQUIRING INSERTION OR COMPLETION WERE FILLED IN AND IN APPLICABLE [SIC] PARAGRAPHS, IF ANY, WERE STRICKEN BEFORE I SIGNED.
Both parents had a lifetime of experience with Marcie's problems. They were curious and knowledgeable about her treatment. The parents knew that the surgery involved inserting a probe through the skull to create a brain lesion, i.e., to destroy certain brain tissue which controlled the area of the brain responsible for the behavioral problems *991 their daughter had.[3] Mrs. Ritz had been for years closely associated and quite active in an organization of parents with retarded children. Under these circumstances, and considering the minimal problems customarily incurred as was testified to by the experts, how much of the specific risks or possible results should be discussed with the consenting parent in order that his consent be "informed"? Nothing in the record answers that question. The jury should not be permitted to speculate on this question any more than should the trial judge or this court. What are the accepted risks, what are foreseeable risks, what are remote and speculative risks require, in our opinion, expert testimony as a basis for determining the extent of disclosures necessary to constitute consent as "informed." The patient here did not die, so any failure to disclose that risk is academic only.[4] The same argument can be made with regard to "paralysis," because the record shows that Marcie suffers from a weakness on the left side, not a complete inability to use that side or a complete absence of motion in it.
It appears that the rule of law in Florida on proof of informed consent is still that expressed in Thomas v. Berrios, 348 So.2d 905 (Fla. 2d DCA 1977), as follows:
The duty of the physician to inform and the extent of the information which may be required varies in each case depending upon the particular circumstances.... The factors involved in making this determination are often complicated and technical, and in any event involve considerations beyond the expertise of the ordinary layman who is uneducated in medicine. Consequently, we have no hesitation in following the lead of our sister court in Ditlow v. Kaplan, 181 So.2d 226 (Fla. 3d DCA 1966), by holding that expert testimony is required in informed consent cases to establish whether a reasonable medical practitioner in the community would make the pertinent disclosures under the same or similar circumstances. Our ruling accords with those of most courts which have considered this issue. Annot., 52 A.L.R.3d 1084 (1973).
*992 Id. at 907. This is still the view in most jurisdictions. Anno. 88 ALR 3d 1008 (1978). The reference in Berrios to the extent of a doctor's duty to advise his patient of the material risks involved, described in Ze-Barth v. Swedish Hospital Medical Center, 81 Wash.2d 12, 499 P.2d 1 (1972), is worthy of repetition. It was said there that:
The duty of a medical doctor to inform his patient of the risks of harm reasonably to be expected from a proposed course of treatment does not place upon the physician a duty to elucidate upon all of the possible risks, but only those of a serious nature. Nor does it contemplate that the patient or those in whose charge he may be are completely ignorant of medical matters. A patient is obliged to exercise the intelligence and act on the knowledge which an ordinary person would bring to the doctors' office. The law does not contemplate that a doctor need conduct a short course in anatomy, medicine, surgery, and therapeutics nor that he do anything which in reasonable standards for practice of medicine in the community might be inimical to the patient's best interests. The doctrine of informed consent does not require the doctor to risk frightening the patient out of a course of treatment which sound medical judgment dictates the patient should undertake, nor does the rule assume that the patient possesses less knowledge of medical matters than a person of ordinary understanding could reasonably be expected to have or by law should be charged with having. Nor should the rule declaring a duty to inform be so stated or applied that a physician, in the interest of protecting himself from an overburden of law suits and the attendant costs upon his time and purse, will always follow the most conservative therapy  which, while of doubtful benefit to the patient exposes the patient to no affirmative medical hazards and the doctor to no risks of litigation. Thus, the information required of the doctor by the general rule is that information which a reasonably prudent physician or medical specialist of that medical community should or would know to be essential to enable a patient of ordinary understanding to intelligently decide whether to incur the risk by accepting the proposed treatment or avoid that risk by foregoing it. (emphasis supplied).
Dandashi v. Fine, 397 So.2d 442 (Fla. 3d DCA 1981), is distinguishable. There, on the issue of consent, the record was clear that the patient, with a language barrier, had torn up one consent, and testified that he did not know that the paper he later signed was another consent form. An issue of fact was found on whether the signature had been fraudulently obtained, so that, in law, no consent had been given. No such issue is made here. Similarly, Morganstine v. Rosomoff, 407 So.2d 941 (Fla. 3d DCA 1981), is distinguishable because it was contended there that the consent was fraudulently obtained, thus bringing into play the provision of section 768.46(4)(a), Fla. Stat. (1981). Here, plaintiffs did not allege nor attempt to prove any fraudulent misrepresentations. Cf. Meretsky v. Ellenby, 370 So.2d 1222 (Fla. 3d DCA 1979), [where the evidence revealed no consent at all to operate on the tip of plaintiff's nose, and the court distinguished between issues of no consent and cases where the issue was informed consent].
The consent form signed by Marcella's father, in addition to approving the specific surgery involved, states that the nature and purpose of the operation, possible alternative methods of treatment, the risks involved and the possibility of complications have been fully explained. The consent thus appears to comply with the requirements of section 768.46, Florida Statutes (1981). We find nothing in the statute that changes the rule of law expressed in Ditlow v. Kaplan or Thomas v. Berrios. The statute appears to codify that rule of law. If the plaintiff relies on the absence of informed consent, it is incumbent on plaintiff to provide evidence on the nature of the risks and the reasonable medical standard of disclosure. Without such evidence the jury can only speculate on the existence and extent of possible risks, on alternative *993 methods of treatment and on possible complications.
It is not sufficient to say, with the 20/20 vision of hindsight, that had the consenting person known that a result which does occur could have occurred, no consent would have been given. That is not the test even in those few states which do not require expert testimony on the nature of the risks and the medical standard of disclosure. We would expect no less of a plaintiff alleging malpractice, than to say that if he had known what was going to happen, he would not have consented.
The cases cited by the dissent as support for a rule that requires the physician to prove the community standard for disclosure do not appear to agree on the precise nature of the standard. The Colorado cases cited in the dissent, as exemplified by Hamilton v. Hardy, 37 Colo. App. 375, 549 P.2d 1099 (Ct.App. 1976), follow a rule that the plaintiff need only show that he was uninformed as to material risks inherent in the procedure and when he shows that he was uninformed due to a failure of disclosure, the physician must go forward with the evidence establishing that his failure to disclose conformed with community standards. This rule, it seems to us, leaves much to the imagination of the plaintiff and the jury. The opinions seem to imply that the need to disclose applies only to relevant and material risks, yet there is no indication as to how and by whom the evidence is presented.
In Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (1960), a case relied on by the Colorado courts, the Supreme Court of Kansas held that when facts concerning the actual disclosures to the patient are ascertained, then expert medical testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. Here, too, nothing is said in the opinion about who shoulders the burden, but the opinion emphasizes the rule, correctly we believe, that the burden of proof rests throughout the trial upon the patient who seeks to recover for her injury.
In Miller v. Kennedy, 11 Wash. App. 272, 522 P.2d 852 (Ct.App. 1974), the court held that it was the plaintiff's burden to prove, not only the non-disclosure, but the fact that the given risk not disclosed was relevant and material. Thus, it would appear that expert medical testimony is required, except perhaps in those situations where the material risks are so obvious and well known that lay testimony is appropriate. Miller emphasizes that the plaintiff must prove, not that he would not have consented had a material disclosure been made, but that a reasonably prudent person would not have consented to the procedure had the material risks been disclosed.
We believe the better rule to be that expressed in Ditlow and Thomas, and adopted here. Similarly, if plaintiff relies on fraud as the means of obtaining the signed consent, that should be pleaded and put in issue and here too, the plaintiff has the initial burden of demonstrating that fraud or misrepresentation produced the signature. There is neither allegation nor proof of fraud here.
The judgment is AFFIRMED.
COWART, J., concurs.
SHARP, J., dissents in part, concurs in part, with opinion.
SHARP, Judge, dissenting in part; concurring in part.
I concur with the majority opinion on Point I. However, as to Point II, I think there were fact questions which the jury should have been allowed to determine. Where there are questions of fact, directing a verdict is error because it deprives a party of his constitutional right to trial by a jury of his peers. Stenback v. Racing Associates, Inc., 394 So.2d 1128 (Fla. 4th DCA 1981).
The record here shows there was an issue concerning whether or not Dr. Keller materially misrepresented the gravity of the surgery to be performed on Marcella. Mr. and Mrs. Ritz both testified Dr. Keller failed to tell them that this kind of operation carried *994 the risks of death and paralysis. Mrs. Ritz testified:
[W]e were assured that there was no problem with the surgery  with the operation because it was his specialty, and it was the answer to her problem; and he told us that it would be a very short time in the operating room and a very short stay in the hospital.
* * * * * *
He said that the problem [sic] was designed to relieve her of her problem, that's what the surgery was for, and if it didn't relieve her of the problem, she still wouldn't have any bad effects from the surgery.
Mrs. Ritz further testified;
Q. [I]t's now your feeling he answered you untruthfully, that indeed 
A. That's right.
Q. [H]e knew there were and didn't tell you?
A. That's right.
Dr. Keller assured the Ritzes that he had done many kinds of stereotactic operations, but he did not tell them he had never done an amygdalotomy.
Mr. Ritz testified that had he known of these risks, and Dr. Keller's inexperience, he would not have consented to the surgery. Mr. Ritz testified:
Q. Did he ever tell you that she could get paralyzed or die as a result of this surgery?
A. No, he never 
Q. Had he told you that she could have got paralyzed or died as a result of this surgery, would you have had the surgery for Marcie?
A. No, I wouldn't have.
* * * * * *
Q. Did Dr. Keller ever tell you that he had never done this surgery before September one, '77?
A. No.
Q. Had he told you that he had never done an amygdalotomy prior to September one, '77, would you have had him do the amygdalotomy on Marcie on September one, '77?
A. I certainly would not.
Dr. Keller was called as a witness by the plaintiff, and he testified that he had fully explained to Mr. and Mrs. Ritz the seriousness of the surgery, its potential risks, and the methodology which he planned to employ.[1] He testified that an amygdalotomy is an extremely rare operation. He did not know whether it had ever before been performed in Florida. Only a few medical centers in the United States were then doing this operation (Boston and Indiana). He said he thought he or another doctor doing an amygdalotomy should warn a patient about the danger of paralysis or even death occurring as a possible consequence of this kind of surgery.[2]
Dr. Charles Carter is the former director of Sunland in Orlando, an institution for the severely retarded. He testified that an amygdalotomy is dangerous brain surgery and that it can result in paralysis, death, and infection.
As the majority opinion points out, Marcella produced no expert medical witnesses to testify that, among members with similar training and experience in the same or similar medical community, the accepted standard of medical practice in Dr. Keller's profession is to warn patients of the risks of paralysis and death prior to obtaining a consent to do any amygdalotomy. For this *995 reason only, the trial court granted the appellees' motion for a directed verdict on the issue of consent. The court relied on Thomas v. Berrios, 348 So.2d 905 (Fla. 2d DCA 1977), and Ditlow v. Kaplan, 181 So.2d 226 (Fla. 3d DCA 1965), which hold that, in order to avoid a summary judgment or a directed verdict on the issue of informed consent, the plaintiff must offer evidence of the standard of practice prevailing in the medical community regarding informing patients of risks prior to surgery. This is a rule which applies only in medical malpractice cases, not in suits against other professionals, and it may have the effect of depriving a plaintiff of a right to a jury trial. Therefore, if this rule exists in Florida, it should be construed narrowly, not sweepingly as the majority proposes.
There is no reason to apply this rule to a case involving misrepresentations. I submit that under these circumstances Florida cases do not require expert medical testimony for the plaintiff to sustain his case. See Meretsky v. Ellenby, 370 So.2d 1222 (Fla. 3d DCA 1979). Indeed, such testimony would be superfluous since the point is not that the physician failed to fully disclose the risks of surgery, but that he misrepresented them. Mr. and Mrs. Ritz's testimony, which was disputed by Dr. Keller, supported such a theory. Therefore, this issue should have been resolved by the jury.
This case is similar to Morganstine v. Rosomoff, 407 So.2d 941 (Fla. 3d DCA 1981). In Morganstine, the plaintiff testified the doctor told him the operation was simple and that there would be no complications. However, he suffered permanent weakness after a spinal fusion operation. In this case, the Ritzes testified Dr. Keller said it was a simple operation, and he failed to disclose the major risks he well knew: death and paralysis.
On the issue of informed consent, in the sense that the Ritzes were not as fully informed of the risks of this surgery as they should have been, I submit that it is no longer clear that Ditlow and Thomas are controlling on the necessity for a plaintiff to produce a medical expert witness on the standard of practice in the medical community. Both of those cases involved pre-1975 causes of action. Since then, the Legislature adopted the Florida Medical Consent Law,[3] which provides in part:
(3) No recovery shall be allowed in any court in this state against any physician ... in an action brought for treating, examining, or operating on a patient without his informed consent when:

(a)(1) The action of the physician ... in obtaining the consent of the patient or another person authorized to give consent for the patient was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and
(2) A reasonable individual, from the information provided by the physician ... under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians ... in the same or similar community who perform similar treatments or procedures; or
(b) The patient would reasonably, under all the surrounding circumstances, have undergone such treatment or procedure had he been advised by the physician ... in accordance with the provisions of paragraph (a).
(4)(a) A consent which is evidenced in writing and meets the requirements of subsection (3) shall, if validly signed by the patient or another authorized person, be conclusively presumed to be a valid consent. This presumption may be rebutted if there was a fraudulent misrepresentation *996 of a material fact in obtaining the signature. (Emphasis supplied).
§ 768.46, Fla. Stat. (1981).
This statute expands on and codifies the prior Florida case law, but it makes one fundamental change. The showing of what the acceptable medical practice standard is and whether the doctor followed it is worded as a defense rather than as a part of the plaintiff's prima facie case.[4] Once the plaintiff shows, as in this case, that the defendant-doctor failed to tell him of serious and substantial risks, then logically the burden should shift to the doctor to show that the patient was in fact so informed, or that it is not customary in that medical community to tell a patient about those particular risks. See Mallet v. Pirkey, 171 Colo. 271, 466 P.2d 466 (1970); Hamilton v. Hardy, 37 Colo. App. 375, 549 P.2d 1099 (Ct. App. 1976); Stauffer v. Karabin, 30 Colo. App. 357, 492 P.2d 862 (Ct.App. 1971); Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (1960); Miller v. Kennedy, 11 Wash. App. 272, 522 P.2d 852 (Ct.App. 1974), aff'd, 85 Wash.2d 151, 530 P.2d 334 (Wash. 1975); Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297 (1973).
In a case decided under this new statute, Dandashi v. Fine, 397 So.2d 442 (Fla. 3d DCA 1981), the court held that the lower court erred in directing a verdict on the issue of informed consent in a malpractice case. The court quoted subsections 768.46(3) and (4)(a) and concluded that the issues of consent and informed consent were properly for the jury.
In determining whether the presumption [in subsection 4(a)] should apply the trier of fact is obligated to consider all the circumstances including the medical procedure proposed, the risks inherent in the procedure, and in that light, the adequacy and reliability of the means chosen to communicate the information to appellant, considering also the known language difficulty.
As to defendant Fine it was error to direct a verdict. A review of the entire record shows sufficient evidence to survive a motion for directed verdict on the issue of informed consent. The testimony of Dandashi, his family members, along with that of Dr. Tenzel and Dr. Ballantyne by deposition, presented sufficient evidence, though conflicting or susceptible of different inferences, tending to prove plaintiff's case.
Id. at 446. There is no discussion in Dandashi about the necessity for the plaintiff to present expert medical testimony on the standard of information given for Dandashi's operation. Apparently, neither expert's deposition proffered at trial covered that point.
But even if medical testimony about the standard of information regarding risks is required under section 768.46 to establish the plaintiff's prima facie case on informed consent in a normal case, I do not think it should be required in this case because of the unusual circumstances presented.[5] Here, the medical testimony of Dr. Keller, Dr. Charles Carter and Dr. M. Hunter Brown established, before the close of the plaintiff's case, that the operation performed on Marcella was very rare. Dr. Keller did not know whether it had ever been done in Florida, and it was proven that the operation was being done in only a few places in the United States. That supports a clear inference that there may be no accepted or established community standard concerning what information about risks is told to patients about to undergo an amygdalotomy in Dr. Keller's medical community. *997 As far as Florida is concerned, it appears Keller is a "community" of one. He testified he would inform his patients about the risks of death and paralysis. Whether he did or not was a question of fact bitterly in dispute according to the testimony. See Atkins v. Humes, 110 So.2d 663 (Fla. 1959).
Further, the medical testimony established that this is the kind of surgery that carries the most severe kinds of risks. From this it could be inferred that any reasonable discussion by a physician would include the big ones: death and paralysis.[6] Since the Ritzes' testimony established they were not told of these major risks, a jury issue was presented. Bowers v. Talmage, 159 So.2d 888 (Fla. 3d DCA 1963); see also Calabrese v. Trenton State College, 162 N.J. Super. 145, 392 A.2d 600 (Ct.App.Div. 1978).
For the reasons stated, I would reverse the judgment and remand this cause for trial on the issues of informed consent and lack of consent because of misrepresentations on the part of Dr. Keller.
NOTES
[1] This statute contained the same language in 1977 when Marcella's surgery was performed.
[2] The doctor was asked, however, if the failure to secure Marcella's consent was a deviation from the recognized standard of care and he made the rather incredible statement that the patient's consent should have been obtained, despite his agreement that she was incompetent, had an I.Q. of about 25, and would not have understood anything she was told about the operation.
[3] Mrs. Ritz's familiarity with the medical terminology is demonstrated by her testimony, viz:

.....
Q. Then, after Marcie was out of the hospital and went back over to Sunland, you and Mr. Ritz went to his office, Doctor Keller's office on some occasion and had a sit-down discussion about surgery?
A. That was to discuss the brain scan and the tests that were taken of Marcie when she 
Q. Don't imagine you remember what date it was, and he doesn't either, but was it fairly soon after she got out of the May hospitalization?
A. She was in the hospital for the purpose of these tests to determine whether or not surgery  she was a candidate for surgery, and it was shortly after he had these reports and read them that we were directed to come down to his office and discuss it.
Q. Okay.
A. I would say within two weeks after.
Q. All right. So, probably May or June of 1977?
A. Yes, still May, I would say it was still in May.
Q. All right. And you all met in his office and talked about for about forty-five minutes on the 
A. We met at his office and talked for at least a half an hour.
Q. And he told you about the surgery, told you how it's done, told you what it was like, gave you a description of it, and that sort of thing?
A. He told us about the CAT Scan and about the test that Marcie was  had taken, and he discussed the type of surgery, and said that she was a perfect candidate for that type of surgery, that since nothing else had worked for her that that was the answer for her problem.
Q. And you actually discussed amygdalotomies?
A. We discussed brain surgery and placing a lesion to alleviate her problem. We were assured that the CAT Scan revealed a perfectly normal brain, and the E.E.G. revealed no problems whatsoever.
Therefore, all he had to do was follow the normal pattern that anyone would take for surgery, and that he anticipated no problems because of the scan showing there was no lesions or nothing.
.....
[4] It can also be said that any person should know that drilling holes in the skull and inserting a probe for the purpose of destroying brain tissue involves certain dangers, one of which is death.
[1] He testified:

A. Well, I specifically mentioned that there was a possibility of a paralysis from this type of surgery.
Q. Death?
A. Death.
Q. That her condition might worsen?
A. Ah, I know that came up.
[2] Dr. Keller testified:

You can't discuss any operation of this gravity without discussing risks... . [I]t's a general rule that risk factor, with regard to stereotactic amygdalotomy, is fairly small.
* * * * * *
I told her [Mrs. Ritz] it was a major operation, and that complications can occur, complications any time you operate on the brain. There is a possibility of paralysis. There is a remote possibility of death even.
[3] § 768.46, Fla. Stat. (1981). This statute was originally enacted as section 768.132, Florida Statutes (1975). Ch. 75-9, § 11, Laws of Fla.
[4] Compare Wale v. Barnes, 278 So.2d 601 (Fla. 1973), a pre-1975 case where the court held the plaintiff must carry the burden of proving the standard and whether the doctor complied with it.
[5] The requirement of medical experts to establish standards of information or standards of practice has received increasing criticism by other courts. See Cobbs v. Grant, 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1 (1972); Hamilton v. Hardy, 37 Colo. App. 375, 549 P.2d 1099 (Ct. App. 1976); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676 (1972); Miller v. Kennedy, 11 Wash. App. 272, 522 P.2d 852 (Ct.App. 1974), aff'd, 85 Wash.2d 151, 530 P.2d 334 (Wash. 1975); see also Informed Consent in Medical Malpractice, 55 Cal.L.Rev. 1396 (1967).
[6] See Cobbs v. Grant; Hamilton v. Hardy; Collins v. Meeker, 198 Kan. 390, 424 P.2d 488 (1967); Mitchell v. Robinson, 334 S.W.2d 11 (Mo. 1960).