823 So.2d 215 (2002)
Carl GOUVEIA, Appellant,
v.
F. Leigh PHILLIPS, M.D.; F. Leigh Phillips, III, M.D., P.A.; and Cosmeplast Corp., Appellees.
No. 4D99-3951.
District Court of Appeal of Florida, Fourth District.
July 31, 2002.
*216 Marjorie Gadarian Graham of Marjorie Gadarian Graham, P.A., Palm Beach Gardens, and Brian J. Glick of Glick & Retamar, Boca Raton, for appellant.
Esther E. Galicia of George, Hartz, Lundeen & Fulmer, Fort Lauderdale, for appellees.
FARMER, J.

CORRECTED OPINION
We withdraw our previous opinion released on April 24, 2002, and substitute this corrected opinion.
*217 A wise person once quipped that Britain and America are two nations divided by a common language. It seems that this intuition is equally pertinent to smaller universes. Here the lawyers and an expert witness all seem to have been separated by their disparate understandings of the same words. This verbal divide affected the outcome of a trial, and now they must try part of the case again. Perhaps we can suggest an accommodation to their language divide.
We first paint the background. Plaintiff is an artist. On a June night in 1994, he and his girlfriend celebrated her birthday with a quantity of alcohol and cannabis. While he was riding as a passenger in her van, she collided with another vehicle and rolled over. His right hand was crushed between the van and a palm tree. He suffered serious injuries to the hand with which he did his art and was rushed to a hospital.
When he arrived at the emergency room shortly after midnight, he was under the effects of the alcohol and marijuana, not to mention his injuries. The defendant, Doctor Phillips (surgeon), is not the emergency room doctor who initially saw him, but the surgeon who was soon called. Initially surgeon spoke to a nurse by telephone. The nurse's notes of the call do not mention surgical amputation. The nurse explained to the artist that he had to sign a preprinted, consent form and that surgeon would talk to him when he arrived and explain the procedures to him. He testified that no one told him what procedures were being contemplated other than the general notion of treating his injured right hand. He remembers signing the consent form with his other hand.
The form indicates that plaintiff signed it about 35-40 minutes before surgeon arrived at the hospital. There is evidence supporting an inference that the time of plaintiff's signature was later changed to indicate signing after surgeon's arrival at the hospital. Surgeon's written orders indicate that after he arrived at the hospital he ordered the nurse to add the handwritten words "possible amputation of fingers right hand" to the consent form already signed by the patient. No new consent form was prepared by anyone at the hospital or signed by plaintiff to indicate specific disclosure of amputation and authority to do so.
Surgeon testified that when he later arrived for the surgery, he introduced himself to his patient. Plaintiff remembers telling surgeon: "I'm an artist. You need to save my fingers." Plaintiff further testified that surgeon said nothing further to him, nothing about what kind of surgery he contemplated, and that he proceeded to take photographs of his hand. Specifically he testified that surgeon never told him that he would amputate his fingers. The surgeon testified, however, that he told his patient that amputation was possible.
In any event, when surgery was performed, his fingers were amputated. The loss of them, it seems, has significantly altered his former artistic abilities.
Over two years later the patient sued surgeon. He alleged that the surgeon negligently performed the surgery and, additionally, amputated without his "full and informed" consent. Specifically he alleged that if "alternatives [had] been explained to him as a reasonable and prudent physician should have explained to him, he would not have consented to the procedure." He also alleged that if he had "understood the nature of the risks involved, and the subsequent complications of said risks, he would not have consented *218 to the procedure utilized."[1] Whatever the allegations were, at trial the patient sought to prove three essentially alternative claims:
A. that the surgeon was negligent in performing the surgery;
B. that he was intoxicated by alcohol and under the influence of drugs (cannabis)[2] when the doctor sought his consent for surgery and that this intoxicated condition would have led a reasonably prudent doctor either to forego surgery or, if medically necessary, obtain consent in some other way;[3] and
C. that in soliciting his consent the doctor did not disclose that amputation was a possibility and that therefore he signed the consent form without having been so informed.
Apparently these had essentially been his claims all along.
We pause at this point as to the classification of the patient's claims. To begin, it is obvious that claim A was what has come to be a conventional medical negligence claim in which the patient seeks to assail the medical judgment of the surgeon. Here the patient might attack the surgeon's decision that amputation was medically indicated instead of less drastic alternatives, or the surgeon's skill in performing the procedure, or both. Alternatively, claims B and C have something to do with consent for the surgery. Claim B contends that any consent he gave was not voluntary and reliable because of the mind-altering substances he had consumed. In this regard, he sought to show that the standard in the medical profession is not to seek consent from a patient in his condition. In claim C, however, he sought to show that, regardless of the medical sufficiency of any disclosure that may have been given to him or his capacity *219 to assent to surgery, in this instance he never consented to surgical amputation because no one ever told him that it was being considered. It is in the distinctions among claims B and C that communication in this case seems to have failed.
During discovery the patient notified the surgeon that he would offer an expert physician, Dr. Garrod, at trial. In the ways of many medical defendants, the surgeon (or, at least, his lawyers) decided to take a discovery deposition. At that deposition, the surgeon questioned Dr. Garrod as follows:
Q. Have you looked at the informed consent issue in this case?
A. No, not per se.
Q. Do you have any opinions that you're going to be expressing, Doctor Garrod, in this case regarding the informed consent issue?
A. No.
Q. Do you have any opinion that you'll be expressing about whether Carl Gouveia was given adequate or inadequate informed consent about the procedure that was proposed, what the options were, what his knowledge or understanding of what was being relayed to him, anything like that?
A. No.
Q. We can leave that alone?
A. Yes.
. . .
Q. I wanted to ask you about informed consent, and you told me you have no opinion, that sort of thing. Do you have, after speaking with Carl or his mother, any thoughts or information about what was discussed? Look at the next section, it says this, referring to the severe nature of his hand, likelihood of amputations, it says, this was discussed at length with the patient, as well as his mother.
A. Where was that?
Q. I'm sorry, the second page under impression. The only reason I'm asking you this is you met with him and examined and saw him?
A. Right.
Q. I'm wondering if he ever expressed, to your recollection or memories or thoughts, about this topic, that is to say, what was discussed with him and at what length and with what particularity? ...
A. No.
Q. Did he ever say anything about that?
A. No.
Q. You take no position on what was discussed with the patient by Doctor Phillips and what was discussed with the patient's mother and to what extent the degree of injury and the options available were discussed with these people?
A. I don't have any opinion about that. But I do recollect with that one encounter with the patient and his mother the patient basically felt he had four fingers attached to his hand when he went into the operating room and he wound up with some significant amputations and he was obviously angry and that was part of it. I have no specific problem with what was done with the informed consent. I wasn't there and privileged to that discussion.
A. Okay. fine.
The patient's lawyer was in attendance at this deposition and presumably paid attention to this line of examination. Yet he made no attempt to do any questioning of Dr. Garrod of his own to dispel any *220 misimpression that might have been made by Dr. Garrod's answers quoted above as to how plaintiff intended to use the expert witness at trial. For example plaintiff's lawyer did nothing to suggest that the term "informed consent" used in the questioning did or did not encompass the issue as to how a surgeon should proceed to obtain consent when the patient is visibly intoxicated, as well as badly injured. Of course, neither did the defense lawyer ask any questions seeking to elicit the meaning that plaintiff and Dr. Garrod attached to the critical term "informed consent" and whether it also encompassed the patient's contention that surgeon never told him that amputation was indicated.
Later at trial plaintiff sought to adduce testimony from Dr. Garrod as to whether consent could, or should, be obtained from a person under the influence of alcohol or drugs, claim B. The surgeon moved to exclude such testimony, arguing that during this pretrial deposition some eight months earlier Dr. Garrod had disclaimed any opinion regarding "informed consent." He argued that the proposed testimony as to plaintiff's capacity to consent was an attempt to "bushwack" and "sandbag" him and thus should not be permitted by the trial court.
In response, plaintiff sought to distinguish Dr. Garrod's deposition testimony set out above from his proposed opinion at trial. He argued that he was not seeking to have Dr. Garrod give an opinion on whether his signed consent to surgery was "informed" in that it was induced by a medically sufficient disclosure. Rather, he contended, his purpose was to elicit an opinion as to proper standard for obtaining any consent from a patient demonstrably under the influence of alcohol or drugs. Plaintiff noted that while the surgeon may have asked Dr. Garrod in discovery if he would express an opinion as to whether informed consent was appropriately obtained in plaintiff's case, the surgeon did not ever pose the specific hypothetical question whether under the standard in the community consent could or should be sought from a patient under the influence of alcohol or drugsthe particular opinion plaintiff sought to elicit at trial in support of his claim B.
It seems that the trial judge's understanding of the meaning of "informed consent" was closer to the surgeon's than plaintiff's. In excluding the proposed testimony, the trial court explained:
"I will not allow him to offer his opinion on this based upon what I think was pretty clear coverage of the issue in deposition which the doctor said he had no opinion. You certainly could have put [the] defense on notice ahead of time so they could prepare for it."
At that point plaintiff proffered the testimony of Dr. Garrod to the effect that:
"typically if a patient was administered any narcotic or has any alcohol level or any other elicit drug, it is not appropriate to get informed consent from that person because, for obvious reasons, his judgment is impaired."
Later in the case, surgeon moved for a directed verdict on the "informed consent" issue for failure of the plaintiff to adduce any expert testimony as to the applicable standard of disclosure. In granting the motion, the trial judge also refused to submit to the jury the issue as to the credibility question raised by the diametrically opposing testimonies of the patient and the surgeon as to whether the surgeon ever told the patient that amputation was possible. Only claim A was submitted to the jury, which returned a defense verdict.
On this appeal, the principal issues raised by plaintiff are whether the trial court erred in

*221 1. preventing Dr. Garrod from testifying as to the standard of practice for obtaining consent from an intoxicated patient, and
2. directing a verdict on the issue as to whether the patient ever consented to amputation.
We find no error as to issue 1, but do as to issue 2 and reverse for a trial on the issue.

1.
First we address the barred testimony as to the standard of practice for obtaining consent from an intoxicated patient and the resulting directed verdict on that claim. When plaintiff's lawyer sought at trial to ask Dr. Garrod the question as to the standard for consent from an intoxicated patient, the surgeon's lawyer objected as follows:
He knew informed consent was an issue. I raised it in the depo on five separate occasions. I asked about opinions regarding informed consent. He had none. He took no position. I covered it every way I could. To permit this guy to come in here now and through the back door express informed consent opinions is outrageous.
Plaintiff's counsel then responded in part:
Judge he is not in the middle of "he said-she said." "Dr. Phillips told me." "No, Dr. Phillips didn't tell me." He has no opinions on those or not.... I'm asking a hypothetical based on all the testimony: what the procedure is if somebody presents themselves. How do I know what the court's rulings are going to be on alcohol, drug use, etc., etc., irrespective of what [defense counsel] may or may notor any lawyer may or may notquestion a witness about? I don't know what the pretrial rulings are going to be.
Obviously there were different understandings of what "informed consent" means at play here.
The exclusion of trial testimony by the expert is governed by Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981); Suarez-Burgos v. Morhaim, 745 So.2d 368 (Fla. 4th DCA 1999); Grau v. Branham, 626 So.2d 1059 (Fla. 4th DCA 1993); and Office Depot, Inc. v. Miller, 584 So.2d 587 (Fla. 4th DCA 1991), all of which, surgeon contends, support the trial judge's decision. That is to say, surgeon argues that this is an instance of a party who offers surprise opinions at trial, evidence that is different in some significant way from that which he gave in pretrial discovery. In Suarez-Burgos, we explained:
"We agree with the trial court that the spirit and purpose of Rule 1.360(b) requires the disclosure of a substantial reversal of opinion such as occurred here, if a party intends to offer that changed opinion at trial. Parties who fail to make such disclosure do so at their peril, depending on the circumstances of the particular case. In this case, allowing the presentation of the changed opinion was tantamount to permitting an undisclosed witness to testify as in [Binger]."
Suarez-Burgos, 745 So.2d at 370-71 (quoting Office Depot). We of course adhere to those views where there has been a change of opinion between a position taken in pretrial discovery and later testimony at trial that prejudices the opposing party. As Binger makes clear, the trial judge's determination in this regard is a matter of discretion, reviewable under the reasonableness test. 401 So.2d at 1313 ("we essentially approve the ... reasoning, which leaves ultimate control over witness disclosure problems to the broad discretion of the trial judge and focuses on prejudice in the preparation and trial of a lawsuit."); *222 see also Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) ("Discretion, in this sense, is abused when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.").
In the memorable line by Strother Martin in Cool Hand Luke, "[w]hat we have here is a failure to communicate." If plaintiff's purpose in designating Dr. Garrod as an expert was to have him testify as to the standard among physicians for obtaining consent when the patient is visibly intoxicated, then it was incumbent on him to communicate that intent at the deposition. Plaintiff could not sit silently by while the witness disclaims any opinion on something that might include a subject on which the expert would be expected to testify at trial.
Because the term "informed consent" used in the deposition questioning was arguably capable of encompassing claim B, plaintiff could have objected to the form of questions about informed consent in the absence of an explicit stipulation limiting the term's meaning to claim A. Failing such a stipulation, plaintiff could have established by his own questioning at the deposition that the witness would in fact render an opinion as to claim B. Without such actions, the expert may mean one thing by informed consent, as happened here, defense counsel another, and plaintiff's counsel still anothernot to mention what the trial judge may end up thinking.
At trial plaintiff proposed to explore what the doctor should do when his disclosure is perfectly proper from the medical perspective but the patient's alcohol/drug induced condition may have affected his judgment about what to decide after such an appropriate disclosure.[4] As we have indicated, the trial judge rejected the proffered testimony on the grounds that it surprised and prejudiced defendant because it was a material change from the deposition testimony. This discrete issue thus focuses on what the patient is capable of doing rather than on the legal correctness of what the doctor did to induce the consent. It is plausible, or at least fairly arguable, for a lawyer and doctor to use the term "informed consent" in that sense. As Binger and the cases cited above make clear, the test for exclusion of evidence for non-disclosure during pretrial discovery is whether the opposing party was prejudiced in his preparations for trial. Here we conclude that a reasonable trial judge could have so found. Under these circumstances, we are unable to agree that discretion has been abused. Therefore, there is no error in the exclusion of an opinion by Dr. Garrod as to plaintiff's claim B.

2.
In granting surgeon's motion for directed verdict on the "informed consent" issue, made at the conclusion of all the evidence, the trial court explained:
if I was allowed to have a gut reaction, my reaction would be to let informed consent go to the jury because in my mind it is really a black and white issue: "He told me I might lose my fingers." "He didn't tell me." ... [E]very case I've read seems to clearly stand for the proposition that you need expert testimony *223 to establish what should have been said and done to establish informed consent when the issue is whether the consent was or was not informed.
Obviously the trial court understood the term "informed consent" to embrace the issue as to whether plaintiff ever consented to the surgical amputation. The essence of his holding in granting the directed verdict was that medical expert testimony is necessary to resolve the issue as to whether surgeon ever told plaintiff that surgical amputation was indicated and being considered.
Plaintiff argues that the directed verdict issue is simple: whether there was evidence that plaintiff did not consent to amputation regardless of whether any other consent he might have given was informed, uninformed, misinformed, drug induced or clearheaded. Plaintiff contends that there was a factual conflict demonstrated in the opposing testimonies of plaintiff and the surgeon as to whether the surgeon ever told his patient of the possibility of amputation. Unless the surgeon told plaintiff of the prospect of amputation, plaintiff argues, he cannot be deemed to have consented to it.
The question presented is whether the absence of medical expert testimony is a legal reason to take the factual dispute away from the jury. Here it seems important to consider in broad outline the history of the tort claim we now describe with the term "medical malpractice." At common law, a damages action by a patient against a physician was typically based on one of two legal theories: a breach of contract for failing to perform the medical treatment promised, or on battery for performing procedures without the consent of the patient. For example, in Slater v. Baker, 95 Eng. Rep. 860 (K.B.1767), where the action was brought in contract, the court said:
"the evidence given does not apply to this action.... The evidence is that the callous of the leg was broke without the plaintiff's consent ... and therefore the action ought to have been trespass vi & armis...."
In none of the common law cases was expert testimony as to the medical judgment of the physician ever suggested as necessary to support a claim for performing surgery without the patient's consent.
By the early twentieth century, battery was well established in the United States as a cause of action by a patient against a physician for damages in performing surgery without the patient's consent. See, e.g., Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (1905) (unnecessary to show in action for assault that physician intended to injure plaintiff by unauthorized surgery); Pratt v. Davis, 224 Ill. 300, 79 N.E. 562 (1906) (action for trespass to the person); and Donald v. Swann, 24 Ala.App. 463, 137 So. 178 (1931) (surgery performed without patient's consent would be an assault and battery or trespass to the person, for which an action would lie). The most often cited opinion is Judge Cardozo's in Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 129-30, 105 N.E. 92, 93 (1914), where he said:
"In the case at hand, the wrong complained of is not merely negligence. It is trespass. Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."
None of these cases mention or imply any necessity of expert testimony to support plaintiffs claim of a battery from surgery without the patient's consent.
Schloendorff received approbation in Florida in Chambers v. Nottebaum, 96 *224 So.2d 716, 718 (Fla. 3d DCA 1957). Chambers involved a physician who administered a spinal anesthetic, contrary to his patient's explicit instructions. The patient sued the physician for an assault, a trespass to the person. The jury found in favor of the patient. In recognizing the validity of the cause of action on appeal, the court quoted Judge Cardozo's words from Sehloendorff. There is no mention in the Chambers opinion of any medical expert witness requirement to support plaintiff's cause of action.
Not long after, the Chambers court faced Zaretsky v. Jacobson, 99 So.2d 730 (Fla. 3d DCA 1958), which involved an appeal of a summary judgment in favor of two physicians sued for malpractice. There the essential claim was that plaintiff had consented to a hernia operation but ended up suffering injury from a different procedure called an aortagram, allegedly done without his consent but which he also claimed was done negligently. The defense argued that the summary judgment was proper because plaintiff had failed to support his claims with expert testimony to show that the aortagram was done negligently. In reversing the summary judgment, the court explained:
"An examination of the pleadings discloses that there are two issues of fact raisedfirst, whether or not the appellant gave his consent to the diagnostic procedure know as an aortagram, and secondly, whether or not in performing the aortagram, the appellees did so in a negligent manner. A reading of the record, including the depositions, convinces this court that the issue of consent raised by the pleadings was not fully and adequately concluded so as to warrant the entry of the summary judgment."
99 So.2d at 731. In short, Zaretsky implicitly holds that expert testimony is not necessary in connection with a medical malpractice claim in which the patient alleges that he did not consent to the procedure performed.
Against this background, the doctrine of informed consent was evolving in the wake of the Nuremberg trials after World War II as a response to Nazi medical experimentation on human subjects.[5] The concept seems to have been first applied by a court in a medical malpractice action in Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170 (1957).[6] The court explained that:
"A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in *225 actually increasing the risks by reason of the physiological results of the apprehension itself."
154 Cal.App.2d at 578, 317 P.2d at 181. One notices that the court did not actually use the term "informed consent" but did plainly introduce the requirement that a surgeon make a certain medical disclosure to the patient to support a valid consent. While Salgo hints at the aspect of medical judgment involved in deciding what to disclose, it does not expressly deal with the necessity of expert testimony in support of a patient's claim that consent was not informed because of some failing in the medical disclosure by the physician involved.[7]
Florida recognized the Salgo doctrine of "informed consent" in Bowers v. Talmage, 159 So.2d 888 (Fla. 3d DCA 1964). Bowers involved summary judgment and a directed verdict in favor of the defendant physicians. The court noted conflicts in the evidence as to whether "informed consent... was obtained from the parents." [e.o.] 159 So.2d at 890. In reversing the summary judgment the court noted:
"there was evidence the parents were not informed by Dr. von Storch of the dangers incident to the operation, and there was testimony by neurosurgeons it was customary to inform those who would make such a decision that the operation was a dangerous procedure." [e.s.]
159 So.2d at 890. This expert testimony was in part the basis for the court's reversal of the summary judgment in favor of the defense, thus implying the necessity of expert opinion evidence in connection with this new tort of "informed consent."
Shortly after came Visingardi v. Tirone, 178 So.2d 135 (Fla. 3d DCA 1965), which addressed the necessity for expert testimony as to whether a consent actually given was sufficiently informed by a proper medical disclosure. The court held that evidence as to the standard of disclosure within the relevant medical community is necessary to support a claim by a patient that his consent to a medical procedure was not informed. Visingardi was soon followed by Ditlow v. Kaplan, 181 So.2d 226 (Fla. 3d DCA 1965), where the court also held that expert testimony as to the standard of disclosure in the medical community was necessary to support a claim that consent was not sufficiently informed where the physician failed to advise of the known risks of the procedure. See also Thomas v. Berrios, 348 So.2d 905 (Fla. 2d DCA 1977) (expert testimony required to establish whether reasonable medical practitioner in the community would make pertinent disclosure under similar circumstances).
To pause at this point, these early cases plainly support a distinction as to the necessity for expert medical testimony in some medical malpractice claims. Under Zaretsky if the claim is based on the common law cause of action in which the patient claims that she did not consent to the medical procedure, no expert testimony is required because the only issue is whether the patient consented. After the informed consent cause of action was recognized in Bowers, however, the courts began to require expert evidence to establish the medical standard as to what should be disclosed to make a consent actually given an "informed" one.
The distinction between a failure to obtain any consent and the failure to make a medically proper disclosure to validate a consent actually given was first directly involved for evidentiary purposes in Meretsky v. Ellenby, 370 So.2d 1222 (Fla. 3d DCA 1979). There the only claim at issue *226 was the count charging battery for performing an operation on the tip of the plaintiff's nose "without and beyond consent." 370 So.2d at 1223. At trial after plaintiff had rested, the trial court granted a directed verdict. On appeal, the third district contrasted the cause of action involving "informed consent" with the common law cause of action for battery where a physician operated without any consent. The court began by citing Chambers v. Nottebaum, quoting its holding that the law "prevents a doctor from operating on a patient without his express or implied consent, or in a manner contrary to the patient's express instructions." 370 So.2d at 1223 (quoting from Chambers, 96 So.2d at 718). In explaining its reversal of the directed verdict, the court went on to explain that:
"It appears the trial court was of the opinion that in order for the plaintiff to recover against the doctor for performance of an operation without the patient's consent, or which was contrary to the patient's express instructions, it was essential for the plaintiff to present evidence of medical experts that the doctor's action was contrary to an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community; and the appellee so contends on appeal. We hold such evidence was not required in this case. [e.s.]
"The requirement for such medical expert testimony in cases based on a claim of absence of informed consent, Bowers v. Talmadge [Talmage], 159 So.2d 888 (Fla. 3d DCA 1963); Ditlow v. Kaplan, 181 So.2d 226, 228 (Fla. 3d DCA 1966); Thomas v. Berrios, 348 So.2d 905, 908 (Fla. 2d DCA 1977); section 768.46(3) and (3)(a)1, Florida Statutes (1977), is not applicable in a case based on a claim of want of consent (as distinguished from a claim of absence of informed consent), or for an operation claimed to have been performed contrary to the patient's instructions.
"In the informed consent cases, the required medical expert testimony is not for the purpose of presenting medical opinion on ... whether ... a patient has a cause of action against a doctor for operating without the patient's informed consent [for which no medical expert testimony is necessary. Cf. Atkins v. Hunes, 110 So.2d 663 (Fla.1959), 81 A.L.R.2d 590]. The medical expert testimony thus required in cases based on claimed absence of informed consent is presented for the purpose of showing whether the disclosure made by the doctor was such as a medical practitioner in that or similar communities reasonably should have given, in order that the patient's consent be an informed consent." [c.o., e.o.]
370 So.2d at 1223-24. Meretsky thus directly confronts the issue we face today, which involves a claim that the patient did not give any consent at all. Under Meretsky this is an issue well within the ken of ordinary juries, even if a claim under "informed consent" would require such expert evidence. Meretsky thus makes the point that it is necessary to distinguish between the issue as to what constitutes a medically sufficient disclosure to validate a consent given, on the one hand, and the entirely separate issue as to whether the patient gave any consent at all because of the failure of the physician to advise the patient as to the precise procedure contemplated.[8]
*227 As the Meretsky court itself recognized, its reversal of the directed verdict was directly supported by the logic of the supreme court's opinion in Atkins v. Humes, 110 So.2d 663 (Fla.1959). Atkins was not an informed consent case. A patient claimed negligence in the provision of medical services but failed to respond to a defense motion for summary judgment with expert testimony. In its discussion of the expert witness requirement in medical malpractice cases the court said:
"Obviously, except in rare cases, neither the court nor the jury can or should be permitted to decide, arbitrarily, what is or is not a proper diagnosis or an acceptable method of treatment of a human ailment. But jurors of ordinary intelligence, sense and judgment are, in many cases, capable of reaching a conclusion, without the aid of expert testimony, in a malpractice case involving a charge of negligence in the application or administration of an approved medical treatment. For example, in the exercise of only common sense and ordinary judgment, a jury would have the right to conclude that it is negligence to permit a wound to heal superficially with nearly half a yard of gauze deeply imbedded in the flesh, to fail to sterilize surgical instruments before performing an operation, to cut off part of a patient's tongue in removing adenoids, to perforate the urethra in performing an operation in which it was necessary to use care not to do so. Even in those cases in which some expert testimony may be required to show causation, the jurors may be authorized to infer from the circumstances that the defendant was negligent in the administration of an approved medical treatment, despite the absence of direct expert testimony to this effect and in the face of expert testimony to the contrary." [c.o.]
110 So.2d at 666. The court concluded that a jury issue was presented and reversed the summary judgment.
Fairly read, Atkins recognizes that medical expert testimony in medical malpractice cases is necessary only when the discrete issue to be decided is not within the abilities of lay jurors. Atkins acknowledged that even some medical subjects may actually be within the ordinary knowledge and experience of jurors. The principle emerging from Atkins is thus that the requirement for medical expert testimony should not be uncritically applied in all medical malpractice cases to all issues. It is incumbent upon the parties and the court to understand the distinctions among the various issues in the various kinds of medical malpractice claims. Not all issues entail a need for experts to explain medical arcana to lay juries.
Thus in the Florida cases discussed in the foregoing paragraphs and particularly the holding in Zaretsky, it is necessary to distinguish one case, in which a patient *228 claims no consent was given, from another case in which the patient challenges the medical judgment of the physician in choosing what to disclose to induce consent. No medical expert testimony is required to sustain an ages-old claim for performing surgery without the patient's consent.
Cases outside Florida recognize the same distinction we apply today. See Grabowski v. Quigley, 454 Pa.Super. 27, 684 A.2d 610 (1996) (while expert medical testimony is necessary in informed consent case, it is not necessary where case involves patient's lack of consent to surgery); Tom v. Lenox Hill Hosp., 165 Misc.2d 313, 627 N.Y.S.2d 874 (1995) (patient's claim that he never consented to performance of procedure by particular physician did not require expert medical testimony as would normally be true with informed consent claim, since informed consent was form of malpractice and patient's claim was premised on battery); and Perna v. Pirozzi, 92 N.J. 446, 457 A.2d 431 (1983) (under informed consent doctrine, patient who consents to surgery may show that surgeon withheld information concerning inherent, potential hazards of proposed treatment, alternatives to treatment if any, and results likely if patient remains untreated; in action predicated upon absence of consent, patient need not prove initially that the physician has deviated from professional standard of care).
There is, of course, a necessary overlap between the two different causes we have been discussing. Both the common law cause of action in trespass for operating without any consent and the later informed consent cause of action for improperly inducing consent, as we have seen, are related to the personal autonomy of patients. In both instances the law is concerned that the patient be the person who decides on the medical procedure. The requirement of a medically appropriate disclosure by the practitioner seeking consent to a specific medical procedure is designed to insure that consent to that surgery is reasonably informed by the patient's knowledge of the nature and extent of the procedure involved, as well as the risks and benefits, and possible outcomes.[9] Only practitioners with knowledge about the medical subject involved are competent to prescribe what information must be imparted. If the claim on trial is that the disclosure made by the physician was inaccurate or inadequate, the trier of fact will have to know what would be accurate or adequate according to that physician's "community" or specialty. For that kind of claim, expert testimony will be necessary for the jury to assess plaintiff's claim that the medical disclosure was incorrect or incomplete in some relevant way.
But such expert testimony would not seem to contribute muchif anything at allwhere the issue is merely whether to believe the patient or the surgeon as to whether consent for a specific procedure was sought by the surgeon. In this latter circumstance, the jury is fully capable without speculation or arbitrary decisionmaking, see Atkins, 110 So.2d at 666, to determine whether the surgeon actually disclosed to the patient what he claims to have said. This is an ordinary credibility decision that juries make in numerous cases.
*229 The directed verdict motion in this case was made in connection with a claim that the patient never consented to amputation. The surgeon's defense had been that amputation was medically indicated by the circumstances plaintiff presented that night, and that he so advised his patient. By his testimony surgeon concedes that, as a result of the condition presented that night, the medical standard required that amputation be disclosed. He goes on to maintain forcefully that he did in fact disclose it.
Just as unequivocally, however, patient says "not so." He testified that the surgeon never told him, either directly or through the nurse before he arrived for surgery, that amputation was being considered. These contradictory versions of the facts created a non-expert, jury issue as to whether plaintiff knew of and consented to amputation.[10] The defense has not shown that expert testimony would be logically relevant to the jury's ability to resolve the conflict between the physician and patient as to whether amputation was really disclosed, as the surgeon claims.
As we said earlier, the trial court's resolution turned on a failure of the participants to communicate by using the term "informed consent" in its original sense. They often meant to include within its confines the issue as to whether the patient had given any consent at all.[11] That is, they were including within its meaning the issue whether the surgeon ever told his patient that surgical amputation of some or all of his fingers was indicated or possible. In short they merged the common law, no-consent claim, as to whether the patient gave any consent at all, with the entirely different, modern theory of whether the patient who actually gave a consent was provided sufficient medical information in order to make a knowing decision to allow a certain surgery on the patient's body.[12] The intermixture of these disparate claims under the heading of "informed consent" led the trial court to conclude that expert testimony was necessary to establish whether plaintiff had given any consent to the amputation of his fingers.
To treat the issue whether there was any consent at all as identical to informed consent is either to make the adjective informed or the noun consent superfluous. It is also to ignore the history of medical malpractice litigation. The defense does not explain why testimony as to the standard of practice about what to disclose would advance the jury's ability to resolve the credibility issue between the patient and the surgeon.[13] Medical experts are *230 necessary only to supply the informed when the patient admits consenting but the surgeon's judgment about what should have been disclosed is challenged as being a departure from the prevailing standard within the medical specialty.[14]
We conclude that, in considering the motion for directed verdict on the issue actually involved, the trial judge should have held that the existence (or not) of simple consent is different from whether an informed consent was induced by a proper medical disclosure. The requirement for an expert witness has no application when, as here, the patient's claim is that he did not in fact consent to the procedure that the surgeon performed. In addition to the conflicting testimony between the patient and surgeon, there was evidence from which a jury might find that the consent form had been altered and the handwritten words added well after the patient signed the form. Clearly there was a jury issue as to whether plaintiff ever consented to a possible amputation. Another jury will have to resolve that conflict in the evidence.
REVERSED.
TAYLOR, J., concurs.
MAY, J., concurs specially with opinion.
MAY, J., specially concurring.
I agree with the majority and applaud Judge Farmer's ability to decipher and, for the first time, clearly articulate a third cause of action-battery. I write to express my concern about the failure to clearly plead and argue that claim. The claim was hidden under the guise of informed consent to such an extent that neither the defense nor the trial court could properly address it at trial.
In the short time given the trial court to consider the issue during the hearing on the motion for directed verdict, the trial court struggled to make sense of the plaintiff's unclear argument.
[I]f I was allowed to have a gut reaction, my reaction would be to let informed consent go to the jury because in my mind it is really a black and white issue: "He told me I might lose my fingers." "He didn't tell me." ... [E]very case I've read seems to clearly stand for the proposition that you need expert testimony *231 to establish what should have been said and done to establish informed consent when the issue is whether the consent was or was not informed.
Despite the lack of clarity, the trial court caught a glimpse of the battery claim, and for that the trial court should be commended. While the factual issue may have been discussed throughout the case, there was no meeting of the minds or as Judge Farmer would say there was "a failure to communicate." It was this failure that has created the quagmire in which we now find ourselves.
As an appellate court, it is our responsibility to review the issues presented to the trial court and, under varying standards of review, determine whether there was error. Because the issue was discussed during all phases of this case, albeit without any clarity, the issue of whether the plaintiff actually consented to the amputation of his fingers deserves to be determined by the jury. Therefore, I join the majority and agree to the reversal for a new trial on this issue alone.
NOTES
[1] The surgeon argues that the complaint fails to allege the issues on which this appeal turns with anything approaching clarity. We agree that it did not; it is ambiguous. Only the above quoted passage as well as an earlier paragraph come even close to stating the two theories of liability plaintiff argues on appeal. We of course are bound to read all pleadings with some generosity and tolerance. See Fla. R. Civ. P. 1.110(g) ("All pleadings shall be construed so as to do substantial justice."). When a pleading may be read alternatively in a way to state a particular claim, yet also in still another way not to state the claim, the only effect of the rule is to require that we read it to state the claim.

In any case, after a review of this record we conclude that the surgeon was certainly aware of both issues well before and during trial. There were several defense motions for summary judgment, and in response plaintiff repeatedly made clear his contention that he did not consent to the amputation of his fingers because he was never told before the first surgery that it was a possibility. He also argued several times that his mental/physical condition affected his judgment, thus vitiating his ability to give a valid consent. Therefore whether clearly pleaded or not these issues were tried with the consent of the parties.
[2] There is no issue in this case arising under section 768.36(2), as it has not been raised in any pleading. See § 768.36, Fla. Stat. (2000) ("In any civil action, a plaintiff may not recover any damages for loss or injur to his or her person or property if the trier of fact finds that, at the time the plaintiff was injured, (a) the plaintiff was under the influence of any alcoholic beverage or drug to the extent that the plaintiff's normal faculties were impaired or the plaintiff had a blood or breath alcohol level of 0.08 percent or higher; and (b) As a result of the influence of such alcoholic beverage or drug the plaintiff was more than 50 percent at fault for his or her own harm."). This statute took effect October 1, 1999.
[3] In this case, for example, the evidence indicates that either the surgeon or the hospital staff, or both, spoke to the patient's mother on the subject of consent to the surgery. No one has raised an issue as to what authority a parent might have to consent to surgery for an emancipated, unmarried, adult child who appears temporarily and circumstantially incompetent.
[4] See § 766.103(4)(b), Fla. Stat. (2000) ("A valid signature is one which is given by a person who under all the surrounding circumstances is mentally and physically competent to give consent.").
[5] See Richard W. Garnett, Why Informed Consent: Human Experimentation and the Ethics of Autonomy, 36 CATH. LAWYER 455, 469-75 (1996).
[6] See W. John Thomas, Informed Consent, the Placebo Effect, and the Revenge of Thomas Percival, 22 J. LEGAL MED. 313, 316 (2001).
[7] There is an issue as to medical expert testimony but it addresses defense witnesses.
[8] Meretsky was relied on by Judge Sharp in her dissent in Ritz v. Florida Patient's Compensation Fund, 436 So.2d 987 (Fla. 5th DCA 1983) (Sharp, J., dissenting). There she related an identical directed verdict issue to a plaintiff's burden of establishing a prima facie case of medical negligence. As we have seen, the rule since Visingardi is that plaintiff must offer evidence of the standard of medical practice as to informing patients of risks prior to surgery. 436 So.2d at 995. As she points out, however, the expert witness requirement should not be applied to claim involving misrepresentations by a doctor advising surgery:

"under these circumstances Florida cases do not require expert medical testimony for the plaintiff to sustain his case. Indeed, such testimony would be superfluous since the point is not that the physician failed to fully disclose the risks of surgery, but that he misrepresented them."
436 So.2d at 995. In the case we face today, the argument is similarly that plaintiff did not require an expert opinion to show that in spite of surgeon's assertions, he was never told of the possibility of an amputation and thus that any consent he gave to surgery did not include the removal of his fingers.
[9] See § 766.103(3)(a)(2), Fla. Stat. (2000) ("A reasonable individual, from the information provided by the physician ... under the circumstances, would have a general understanding of the procedure, the medically acceptable alternative procedures or treatments, and the substantial risks and hazards inherent in the proposed treatment or procedures, which are recognized among other physicians... in the same or similar community who perform similar treatments or procedures.....").
[10] At trial defense counsel argued that expert testimony from a physicianrather than a nursewas necessary as to the "standard within the medical community" for adding notations to consent forms after the patient has already signed them. With all respect, we do not understand section 766.103(3) to contain any such requirement to resolve a dispute as to whether certain handwriting was already on a form when the patient signed it, or whether the patient was previously advised by the physician as to its content before it was added later. These are, it seems to us, paradigm jury credibility questions, not issues as to the medically indicated content of disclosure for surgery.
[11] In fact all of plaintiff's counsel in this case repeatedly use "informed consent" to refer to the issue whether plaintiff ever consented at all to surgical amputation. It is so used in pretrial motions and memoranda, as well as in appellate briefs.
[12] See § 766.103(3)(a)(1) ("The action of the physician ... in obtaining the consent of the patient ... was in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community....").
[13] The record shows that in his argument opposing one of defendant's motions, plaintiff conceded that he was not claiming a battery as a result of an entire "want of consent." We disagree, however, with defendant's argument that this concession also eliminates the amputation consent issue. In context it is clear that he was not conceding away the issue relating to whether defendant ever told him before the surgery that amputation was a possibility. The concession was merely plaintiff's way of illustrating his recognition that he had signed a consentto be sure, a consent that did not encompass amputationand for that reason he could not complain that any surgery at all would have been a battery.

We doubt the utility of the use of terms like "want" of consent and "lack" of informed consent to distinguish the two kinds of claims we have been discussing. If the purpose here is to communicate discrete and different kinds of attacks on a physician's conduct, these terms may obscure the distinction or mislead. In their place we urge those who would communicate in this area to begin with an appreciation of the different implications of no consent at all and an issue as to whether the consent given was informed. When conflict emerges, it is better to specify the precise claims involved and reserve the locution informed consent for only those occasions when the patient assails the medical judgment of the physician in deciding what information to impart to validate a consent given by a patient to the physician.
[14] See § 90.702, Fla. Stat. (2000) ("If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion....").[e.s.]