DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ROBERT COUSINS** and **SCOTT SANKEY**,
Appellants,

v.

**IVETTE DUPREY**,
Appellee.

No. 4D19-3602

[July 21, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; William W. Haury, Jr., Judge; L.T. Case No. CACE11-10187(13).

Dinah S. Stein of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, for appellants.

Dennis Grossman of Law Office of Dennis Grossman, Miami, and Max R. Price of Law Office of Max R. Price, P.A., Miami, for appellee.

MAY, J.

Two attorneys appeal a sanctions order entered against them during a medical malpractice trial. They argue the trial court erred in sanctioning them and in determining the amount of the sanction. We agree and reverse.

The underlying case arose from a two-count complaint for medical malpractice.

The plaintiff suffered from Crohn's disease. In 1990, she underwent surgery to remove certain diseased tissue. The defendant doctor first started treating the plaintiff nine years later. In 2007, the plaintiff's gastroenterologist referred her to the doctor to surgically remove a stricture and reconnect the small bowel. In 2008, the doctor performed a laparoscopic small bowel resection.

In the summer of 2009, the plaintiff suffered another flare-up of her Crohn's disease. A colonoscopy revealed inflammation and a protrusion of the small intestine ("prolapsing") at the site of the ileocolonic anastomosis. The prolapse was caused by the stricture at that location that the doctor was supposed to have removed in 2008.

The plaintiff was referred to another physician for a second opinion. She underwent another surgery where the stricture at the ileocolonic anastomosis and two other strictures were removed and reconfigured.

The plaintiff sued the doctor who performed the 2008 surgery and his professional association ("P.A."). She alleged he was negligent in failing to "remove the culprit stricture" at "the site of [the ileocolonic] anastomosis" and failing to inform her "that he did not remove the stricture . . . ." Count two alleged vicarious liability against the doctor's P.A.

The doctor and his P.A. "specifically" denied the allegations and asserted as an affirmative defense that "the care and treatment rendered by [the defendants] were within the requisite standard of medical practice, and at no time was there any deviation from this standard."

### *Discovery*

The doctor submitted the following answer to an interrogatory propounded by the plaintiff.

> 6. Did you perform the surgery on the [p]laintiff, specifically treatment of the stricture at the ileocolonic anastomosis, during the surgery on or about January 14, 2009? If so, please describe specifically any and all evidence of this treatment. If not, why not?
>
> ANSWER: The [p]laintiff's surgery was performed on January 14, 2008, not 2009. Yes, the stricture at the ileocolonic anastomosis was treated during that procedure. [The doctor] recalls treating that area. In addition, three (3) segments of small intestine were submitted for pathologic review.

Attorney Cousins' name appeared below the signature block but only attorney Sankey's email address was listed. Attorney Sankey later testified that he "more likely than not" assisted the doctor with the interrogatory answers. Attorney Cousins testified he did not recall assisting the doctor.

Attorney Sankey later attended the doctor's deposition. Plaintiff's counsel questioned the doctor regarding the operative report he "dictated" following the surgery.

> **Q:** [L]et me just ask you specifically: Because you're being sued in this matter with the allegation that you did not perform any type of procedure of the stricture that [was] located at the ileocolonic anastomosis; correct?
>
> **A:** That's what you're suing me for, yes.
> . . . .
>
> **Q:** Okay. Did you ever inspect that particular area during your procedure?
>
> **A:** Yes.
>
> **Q:** Okay. And according to your report, what part of the report indicates that you specifically examined the ileocolonic anastomosis?
>
> **A:** The abdomen was explored. As you and I talked about earlier, when you do an exploration, you examine all the structure [sic] we talked about.
> . . . .
>
> **Q:** So what you meant by "the abdomen was explored," is that you explored anything and everything within the abdomen, and that also happened to include the stricture at the ileocolonic anastomosis?
>
> **A:** I looked at everything that was diseased, sir, yes.
>
> **Q:** Okay. And that includes the stricture at the ileocolonic anastomosis?
>
> **A:** That's all the stricture—all the disease that was there, I looked at and took care of.

The doctor explained that although his operative report did not state that he examined the stricture at the ileocolonic anastomosis, the stricture was encompassed in the "area of disease" mentioned in the report.

3

**A:** The area of disease that we saw, that I saw during the procedure, is the area I took out.

**Q:** Okay. Doctor, the part that you took out, did it include the ileocolonic anastomosis and the stricture that was located in that area?

**A:** I took out all the areas of stricture that we could see.
. . . .

**A:** I took out all the strictured areas.

**Q:** Is that a yes, then, to my question?

**A:** Everything that looked like disease, I took it out.

**Q:** Doctor, did you remove the stricture at the ileocolonic anastomosis, yes or no?

**A:** I believe I did.

**Q:** You believe you did?

**A:** I believe I did. I took out all the disease.

**Q:** What makes you believe you did, as opposed to maybe you didn't? Where does this belief come from?
. . . .

**A:** All the area that was diseased, I took out.
. . . .

**A:** I removed all the disease we saw.

**Q:** Is the answer to my question yes?

**A:** I took out all the disease I saw.

**Q:** Doctor, is the answer to my question yes? Because I can have [the court reporter] read it back two times or twelve times, but I need an answer to the question.

**A:** I don't have to have it repeated, and I'm trying to answer the best I can.

4

**Q:** Doctor, I don't want to know about all the disease that you took out. I want to know specifically, because you would agree with me that there was disease, there was [a] stricture at the ileocolonic anastomosis, you don't dispute that, do you?
. . . .

**A:** There was—there was disease at the ileocolonic anastomosis.

**Q:** And my question is: Did you remove that specific diseased portion of her small bowel and large colon?

**A:** I believe I did.

**Q:** You believe you did.
. . . .

**Q:** [T]he thing you're getting sued upon in this case, is that you didn't remove this stricture at the ileocolonic anastomosis, you claim that you did; correct?

**A:** Yes.
. . . .

**Q:** Okay. Any particular reason why you would not note in your surgical report your actual surgical removal of this stricture?
. . . .

**A:** Because I removed all of it—I removed all of it, and all the disease in a particular area.

At a subsequent deposition, the doctor's standard of care expert testified the doctor did **not** remove any stricture at the ileocolonic anastomosis. The doctor was "mistaken" at his deposition. Based on the records, the expert testified the doctor examined the ileocolonic anastomosis but, as part of his surgical decision-making process, did not deem it to have a clinically significant stricture requiring removal. The doctor's damage and causation expert and the plaintiff's expert also agreed the doctor did **not** remove the stricture at the ileocolonic anastomosis.

### *The Trial*

5

In opening statement, attorney Cousins stated the doctor would tell the jury he did **not** remove the stricture at the ileocolonic anastomosis "because he made a surgical decision that he removed all the diseased areas that he saw and visualized" and "that was his medical judgment at the time." The plaintiff objected and argued the doctor's new "medical judgment" defense was a "surprise" and contrary to his deposition testimony. The plaintiff requested "[i]n a sense like a motion in limine" that the doctor be prohibited from introducing a new theory that he made a judgment call not to remove the ileocolonic anastomosis stricture.

Attorney Cousins responded the doctor "said a lot of different things in his deposition" because he "was being harangued to the point where I'm convinced [he] would have said anything." The parties were "splitting hairs" because "everything is a judgment call" and the plaintiff never asked him whether he exercised his judgment in making his decision during the surgery. Attorney Cousins suggested that he would instruct the doctor not to use the term "judgment call" in his testimony, but that the "clear inference from [the deposition testimony] is if he didn't think it was diseased, he didn't remove it."

The trial court read through the doctor's deposition testimony. The following discussion took place.

> **Defense Counsel:** There is no dispute that [the doctor] did not remove the anastomosis.
>
> **Court:** What about that portion that I have been looking at in his deposition. . . .
>
> **Defense Counsel:** Entering the fourth hour of the deposition after being repeatedly questioned, repetitive questions from plaintiff's counsel, that's what he said, Judge. But we know that's simply an inaccurate statement. He did not do it.
>
> **Court:** Then do I have an errata on this?
>
> **Defense Counsel:** There was no errata filed, no, sir. I can't now have him get on the stand, Judge, and say something that the doctor knows simply to be inaccurate and factually wrong.
>
> **Court:** But there's been no effort to fix the depo up to this point.

6

**Defense Counsel:** There has not. But our expert clarified that, so it's certainly no surprise what the issue is going to be, Judge.

The plaintiff explained that given the time and money expended in preparing for the trial, the only appropriate remedy would be to strike the doctor's pleadings and have him pay attorney's fees and costs including expert witness fees because "the bell has been rung here and I don't think there is a way to unring that bell." Plaintiff's counsel explained:

> [I]f we allow the doctor to take the stand and start changing all of his testimony, the problem I have is I have got my expert here ready to take the stand, and we're not prepare[d] for that. We assumed he told the truth. Now we found out it was just a lie by the defense all along. And so I can't fix that today in terms of how do I now with this brand new testimony that is going to go in 15 minutes, have my expert prepared to take the stand after him and give testimony, I can't fix that.

At attorney Cousins' request, the trial court required the plaintiff to file a written motion, ordered an evidentiary hearing, and suspended the trial. The plaintiff then moved in writing to strike defendants' pleadings, enter a default, and impose sanctions for willful misconduct.

### *The Sanctions Hearing*

At the evidentiary hearing, just before the doctor began to testify, the trial court advised him of his *Miranda* rights. The doctor then testified that the ileocolonic anastomosis did not appear to be clinically significant at the time of his operation and that he did **not** testify as such during his deposition. He further testified that it was not the first time he was offering the testimony because: "I actually said it during my testimony during the deposition. I kept saying that the small bowel was the diseased area and that I evaluated the ileocolonic anastomosis." He also testified that it was his intention to testify at trial that he purposely left the ileocolonic anastomosis that was strictured because it was not clinically significant compared to the other areas he saw based on his medical judgment.

When asked why he denied the allegation that he did not remove the culprit stricture in his answers and affirmative defenses, he testified that he did not recall telling the plaintiff he had removed the stricture at the ileocolonic anastomosis, but that "normally I would say that we took care of the disease." He testified "if it wasn't significant, then it didn't need to come out." Later, he conceded that his pre-op notes indicated the plaintiff

7

would require surgery to "remove the stricture at the ileocolonic anastomosis."

Regarding his deposition testimony, the doctor testified:

> **Q:** Okay. And repeatedly you've testified that you did remove the stricture at the ileocolonic anastomosis, did you not?
>
> **A:** I also said multiple times beforehand that I took out the disease process. I did not mention the ileocolonic anastomosis until we had—had been asked so many times.
> . . . .
>
> **Q:** [R]epeatedly you gave unequivocal answers that you had, in fact, removed the stricture at the ileocolonic anastomosis; is that correct?
>
> **A:** I did answer that question. I did not intentionally want to misrepresent or deceive anybody answering it that way. If the—if your Honor would have been at the deposition, my mindset starting off and continuing throughout the whole deposition became more and more agitated. I am not used to having depositions done by video. In fact, I've never had a video deposition before. And between the deposition and the arguments between both counsels, myself, my counsel, and [plaintiff's counsel], I became more and more agitated to the point where I would actually answer any question and I would say anything that anybody would want to hear me say.

The doctor also testified that the last time he saw his deposition was the night before the trial. "[W]hen I looked at what was there, I was aghast. I couldn't believe what was coming out of my mouth."

When asked whether his attorneys knew he had left in the stricture as part of his judgment call, attorney Cousins objected on attorney-client privilege grounds. The trial court asked why it wouldn't fall under the crime-fraud exception to the privilege, to which attorney Cousins responded that the exception was inapplicable absent intent to defraud.

When plaintiff's counsel began to question the doctor regarding his interrogatory responses that were signed under penalty of perjury, attorney Cousins advised him to invoke his Fifth Amendment privilege, which he subsequently did for the remaining questions. Plaintiff's counsel then again asked whether he had conveyed the "truth of the matter" to

8

attorney Cousins.  Again, attorney Cousins objected on grounds that it involved attorney-client privilege.  At that point, the trial court overruled the objection "as an exception."

At the conclusion of direct examination, attorney Cousins stated that he would withhold any cross-examination and requested a continuance of the hearing for the doctor to seek criminal counsel.  The trial court had the doctor step down.  Plaintiff's counsel then called attorney Cousins to the stand.  Attorney Cousins objected to taking the stand without criminal counsel.

The trial court told attorney Cousins to present his case, to which the doctor's new counsel responded that she couldn't put defense counsel on the stand because although she was "fully prepared to put on counsel to present their testimony, . . . I'm very concerned right now that there's a conflict with me presenting their testimony on behalf of the doctor who I filed an appearance on behalf of.  And I think I'm now in a conflict position as well, bringing out testimony from them."

Following another recess, the following discussion occurred.

> **Plaintiff's Counsel:**  . . . [D]id you, defense counsel, at any time prior to the start of this trial, advise plaintiff or plaintiff's counsel that [the doctor] himself was now stating and taking a new position that he did not take the stricture out?
> . . . .
>
> **Attorney Cousins:**  [addressing the court]  I don't believe, even when I learned of it, which was very shortly before the trial, I—it's work product, but I did not review the deposition until very shortly before we started the case.
>
> **Court:**  Now, why no errata?
>
> **Attorney Cousins:**  Your Honor, I wasn't present at the deposition.  I didn't review the transcript until very shortly before this trial proceeding started.
>
> **Court:**  Well, I'm assuming it's an office practice for someone to look at the transcript at some point, isn't it, within the time frame?
>
> **Attorney Cousins:**  You're asking an office practice, your [h]onor.  I—it's my understanding the transcript was

forwarded to the doctor, but I can speak hypothetically. . . . I have no specific facts about why an errata wasn't involved in this case, your [h]onor, because I didn't review it until very literally shortly before the trial. But had I reviewed it— okay?—had I reviewed it, I would not have filed an errata sheet either, for two of the followings reasons—and this is hypothetical. I didn't review the transcript. I didn't represent the doctor at the deposition. Number one, to me it's such an obvious inaccuracy there would be no reason to alter or reflect that because counsel knew at the time he asked the question that he elicited an inaccurate response from the doctor. But number two, it was my understanding of the case law that, had an errata been filed, it simply would have subjected the doctor to another session of this intolerable proceeding conducted by [plaintiff's counsel].

. . . .

**Plaintiff's Counsel:** . . . [T]he first time you personally became aware of [the doctor's] claim that he did, in fact, remove the stricture at the ileocolonic anastomosis was within a month of trial; is that correct?

**Attorney Cousins**: Less than a month.

When asked why he didn't update the doctor's response to interrogatory six, attorney Cousins testified, "You have to look at Question No. 1 that says in the response he says, 'I saw and examined the anastomosis and I treated it.' I mean, to me that's entirely consistent with what he did." He maintained the interrogatory responses were "true and correct and they're totally consistent with his testimony."

Attorney Sankey testified that when he met with his experts, he realized the doctor has made some misstatements in his deposition.

### *The Sanctions Order*

The trial court entered an order partially granting the plaintiff's motion for sanctions. The order precluded the doctor and his experts from claiming he did not remove the "culprit stricture" at the ileocolonic anastomosis as a matter of medical judgment because it was not pled as an affirmative defense. The court found the doctor "did not tell the truth" during his deposition as to his "claim that he had removed the subject stricture," and by doing so was "successful in concealing other elements

10

of his defense," namely, that he left the stricture in as a result of his medical judgment.

The trial court found that both defense counsel, upon learning of the "false testimony," purposely did not bring the testimony to the attention of the plaintiff, her counsel, or the court prior to the second day of trial "in order to gain an unfair advantage over [the plaintiff] and her legal counsel." While the trial court found that defense counsel's argument that plaintiff's counsel "should have known" of the doctor's new testimony was not a reasonable explanation, the trial court did not find there was a fraud on the court requiring the striking of pleadings. There was an "abundance" of evidence that the stricture had not been removed that mitigated the false testimony.

Nevertheless, the trial court awarded attorney's fees and costs against the doctor and defense counsel jointly and severally. The order provided that "sanctions shall include the time that [the plaintiff] and her counsel have expended in the two weeks prior to trial in preparing for trial, the aborted trial, and all time expended in connection with [the plaintiff's] motion as well as costs in connection therewith." After an evidentiary hearing, the trial court awarded $271,487.82.

The plaintiff settled with the doctor and his P.A. The medical malpractice and sanction claims against the doctor and his P.A. were then dismissed with prejudice, leaving the sanctions order pending against defense counsel only. From this order both defense counsel now appeal.

### *The Appeal*

On appeal, both attorneys argue the trial court erred in imposing sanctions for alleged fraudulent or litigation misconduct because they did not engage in such conduct. Even if they had, they argue the trial court's order preventing the defense from introducing testimony that the doctor's surgical decision was based on his medical judgment remedied any prejudice. They also argue the amount of the sanction was excessive.

The plaintiff responds the trial court did not err in sanctioning defense counsel for engaging in bad faith litigation. The plaintiff suggests the award reflects fees and costs incurred due to their conduct. The plaintiff also argues public policy supports the award.

We review an order imposing "sanctions for bad faith litigation conduct . . . [for] an abuse of discretion." *Bennett v. Berges*, 50 So. 3d 1154, 1159 (Fla. 4th DCA 2010).

11

"[A] trial court possesses the inherent authority to impose attorneys' fees against an attorney for bad faith conduct." *Moakley v. Smallwood*, 826 So. 2d 221, 226 (Fla. 2002). This authority, however, is limited. *Id.* at 224.

> [T]he trial court's exercise of the inherent authority to assess attorneys' fees against an attorney **must be based upon an express finding of bad faith conduct** and must be supported by detailed factual findings describing the specific acts of bad faith conduct that resulted in the unnecessary incurrence of attorneys' fees. **[The] finding of bad faith conduct must be predicated on a high degree of specificity in the factual findings.**

*Id.* at 227 (emphasis added). *Moakley* and its progeny govern this appeal and mandate a reversal.

Defense counsel argue they did not engage in fraud or litigation misconduct because: (1) the doctor's deposition testimony, answer, and interrogatory responses were not perjurious; (2) there was no evidence that defense counsel "suborned" the false deposition testimony and interrogatory response; (3) defense counsel were not required to file an errata sheet or update the discovery responses; and (4) there was no prejudice to the plaintiff.

### 1. The Doctor's Deposition Testimony, Answer, and Response to Interrogatory #6 Fail to Support the Sanctions Order.

"[P]erjury is defined as the willful giving of false testimony under lawful oath on a material matter in a judicial proceeding." *Adams v. Murphy*, 394 So. 2d 411, 413 (Fla. 1981). "[S]tatements alleged to be perjurious must be of 'empirical fact' and not of opinion, belief or perception." *Cohen v. State*, 985 So. 2d 1207, 1209 (Fla. 3d DCA 2008).

### a. The Doctor's Deposition Testimony.

At his deposition, the doctor testified he looked at the plaintiff's entire abdomen, including the subject stricture, and removed the diseased area. There is nothing in this testimony that reveals whether the doctor removed the stricture. It is neither inaccurate nor perjurious.

And, to the extent he later testified in deposition that he believed he had removed the stricture, his testimony was based on his belief. "[A]n

expression of belief" cannot constitute perjury because it is not a statement of empirical fact. *See id.* at 1208–09 (reversing perjury conviction where defendant stated his belief). While there was inaccurate testimony, the record does not support a finding that the doctor intentionally testified untruthfully.

The doctrines of estoppel and waiver also weigh against the sanctions order. Plaintiff's counsel became aware of the inaccuracy of some of the doctor's deposition testimony either before or at the same time defense attorney Sankey became aware—at the defense experts' deposition. And, plaintiff's counsel conceded at the evidentiary hearing that he thought the doctor was telling the truth as to what he believed but was mistaken. Plaintiff's counsel is therefore estopped from seeking sanctions for fraud when he acknowledged none existed in the doctor's deposition testimony. *See In re Adoption of D.P.P.,* 158 So. 3d 633, 638–39 (Fla. 5th DCA 2014) ("[T]he doctrine of estoppel prevents a person from unfairly asserting inconsistent positions.").

Once he became aware of the inaccuracy of the doctor's deposition testimony, plaintiff's counsel chose to do nothing. That failure constitutes a waiver. A party waives a fraud claim by failing to change its position after learning of the fraud. *See Picture It Sold Photography, LLC v. Bunkelman,* 287 So. 3d 699, 703–04 (Fla. 4th DCA 2020); *Matusick v. DiSalvo,* 82 So. 3d 1045, 1046 (Fla. 4th DCA 2011).

The record also fails to support any finding that defense counsel knew the doctor's deposition testimony was inaccurate at the time it was taken. Attorney Sankey learned of it at the subsequent deposition of the defense experts. Attorney Cousins learned of it just prior to trial. There simply was no evidence supporting any kind of intentional wrongdoing or intent to defraud on the part of defense counsel when the doctor was deposed.

Contrary to the trial court's determination, defense counsel had no obligation to file an errata sheet to the doctor's deposition. "Testimony taken during a deposition is to be completely that of the deponent, not a version of the testimony which has been edited or glossed by the deponent's lawyer." *Ctr. for Individual Rights v. Chevaldina,* 16-20905-CIV, 2018 WL 4777165, at *2 (S.D. Fla. June 22, 2018).

Here, the doctor did not waive the reading of his deposition. The deposition was forwarded to the doctor for his review, but there is no indication he ever signed off on the deposition. Pursuant to Florida Rule of Civil Procedure 1.310(e), the deposed witness alone can make changes

to the deposition transcript. The doctor testified he reviewed the deposition the night before trial.

Defense counsel had no duty to file an errata sheet. In fact, they would have risked sanctioning had they done so. *See Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1281 (11th Cir. 2010) ("The [deponent's attorney's] submission of the novella-length errata sheet making a slew of material changes to their client's deposition testimony was improper.").[1]

In short, the doctor's deposition testimony neither constituted a fraud on the court nor litigation misconduct. There were no legitimate grounds to sanction defense counsel as they were unaware of the inaccuracy of the doctor's deposition testimony at the time it was given and were under no obligation to correct it.

### b. The Doctor's Response to Interrogatory #6.

The plaintiff also argued the doctor and defense counsel engaged in bad faith misconduct and/or fraud in the doctor's response to Interrogatory #6. But, the response to Interrogatory #6 similarly fails to show any bad faith misconduct or fraud. In fact, defense counsel's actions were entirely proper and based on their understanding of the facts and the law.

Prior to the doctor's deposition, the plaintiff propounded, and the doctor responded to, Interrogatory #6.

> 6. Did you perform the surgery on the [p]laintiff, specifically treatment of the stricture at the ileocolonic anastomosis, during the surgery on or about January 14, 2009? If so, please describe specifically any and all evidence of this treatment. If not, why not?
>
> ANSWER: The [p]laintiff's surgery was performed on January 14, 2008, not 2009. Yes, the stricture at the ileocolonic anastomosis was treated during that procedure. [The doctor]

---

[1] Neither can the trial court's findings against defense counsel be supported by an adverse inference arising from the doctor's invocation of his Fifth Amendment privilege against self-incrimination at the evidentiary hearing. Assuming an adverse inference could arise, it applied only to the party invoking the privilege and not his legal counsel. *See Vasquez v. State,* 777 So. 2d 1200, 1203 (Fla. 3d DCA 2001).

recalls treating that area. In addition, three (3) segments of small intestine were submitted for pathologic review.

Attorney Sankey testified that he "more likely than not" assisted the doctor with the interrogatory answers. Attorney Sankey testified that he did not believe the answer to Interrogatory #6 was false in any way. He had heard in a myriad of other cases that examination of a body part constitutes "treatment" and understood that the doctor examined the ileocolonic anastomosis during the surgical procedure.

Attorney Cousins did not recall assisting the doctor in responding to the interrogatories. He testified the doctor's response to Interrogatory #6 was consistent with his deposition testimony. It was his understanding that an "examination" constitutes "treatment."

Because defense counsel reasonably believed the interrogatory answer was true, they cannot have acted in bad faith or fraudulently. *See Vieira v. Doe*, 813 So. 2d 1030, 1031–32 (Fla. 4th DCA 2002) (reversing sanction where no clear showing of fraud given interrogatory questions were vague and imprecise).

Plaintiff and the trial court's order rely in part on the premise that defense counsel was obliged to update the interrogatory response once they learned the doctor's deposition testimony was inaccurate. But there is no duty to update interrogatory responses. *See Dos Santos v. Carlson*, 806 So. 2d 539, 540 (Fla. 3d DCA 2002) (reversing sanction based on trial court's "legally incorrect" holding that "defendant had 'an obligation to update any discovery . . . a continuing obligation to provide it'"); *see also Binger v. King Pest Control*, 401 So. 2d 1310, 1312 n.4 (Fla. 1981) ("There is no continuing duty of disclosure under Florida's Rules of Civil Procedure . . . ."); Fla. R. Civ. P. 1.280(f) ("A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired.").

On the other hand, plaintiff's counsel had the ability to request updated responses after learning of the inaccuracy of some of the doctor's deposition testimony. Counsel could have specifically asked whether a stricture at the ileocolonic anastomosis was "removed." *See Anthony v. Schmitt*, 557 So. 2d 656, 660 (Fla. 2d DCA 1990) ("[T]he Florida Rules of Civil Procedure never require a party to update answers to interrogatories after material changes render them inaccurate. . . . Thus, it is common for litigants to request updated answers concerning year-old interrogatories."). Defense counsel's understanding of his legal and ethical obligations was not only reasonable but entirely correct.

15

### i. The Trial Court Misapplied the Rules Regulating the Florida Bar.

And lastly, the trial court erred in interpreting the Rules Regulating the Florida Bar. *See Ferere v. Shure*, 65 So. 3d 1141, 1144–45 (Fla. 4th DCA 2011) (reversing order granting sanctions where trial court misinterpreted law). Rule 4-3.3(a)(2) provides: "A lawyer shall not knowingly: (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client."

This rule does not support the sanctions order. First, the record establishes defense counsel's intent to have the doctor testify truthfully at trial. Second, Rule 4-3.3 applies only where an attorney has actual knowledge that evidence to be offered is false. By advising the jury that the doctor would testify he did not remove the stricture at the ileocolonic anastomosis, defense counsel complied with his ethical obligation. *See* Rule 4-3.3(a)(4) ("A lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false.").

### ii. The Trial Court Misapplied a Florida Bar Ethics Opinion.

Similarly, Florida Bar Ethics Opinion 75-19 (Mar. 15, 1977), *aff'd*, Professional Ethics Committee (June 18, 1998), relied upon by the trial court, does not support the sanctions order.[2] Unlike the factual scenario

---

[2] Florida Bar Ethics Opinion 75–19 provides:

> A lawyer inquires as to whether he has a duty to disclose perjury committed by his client in a divorce proceeding deposition wherein the client lied as to certain assets. The lawyer was aware of the true facts during the deposition but was not aware that the client had deliberately lied until after the deposition when the lawyer, in private conversation with the client, asked whether the client knew the true facts and the client responded that he did and that he had deliberately lied to conceal assets. In the inquiry, the lawyer recognizes his duty to withdraw from the employment, and the Committee unanimously agrees.

> DR 7-102(B)(1) provides that "A lawyer who receives information clearly establishing that . . . his client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected

in that opinion, at no time prior to the evidentiary hearing did defense counsel have reason to believe the doctor knew at the time of his deposition that he had not removed the stricture at the ileocolonic anastomosis.

There is no evidence, let alone clear and convincing evidence, that defense counsel engaged in any fraud or willful misconduct regarding the interrogatory response. Because defense counsel reasonably believed the interrogatory answer was true, they cannot be deemed to have acted in bad faith or fraudulently. *See Vieira*, 813 So. 2d at 1031–32.

In short, the trial court abused its discretion in entering the sanctions order.

### c. The Doctor's Answer to the Complaint and Affirmative Defenses.

The plaintiff and trial court also took issue with the defendants' denial or "denial as phrased" of the plaintiff's negligence allegations in paragraphs 9, 10, and 14 of the complaint. However, the defendants denied those paragraphs because the doctor maintained he was not negligent in performing the surgery. The doctor believed the source of plaintiff's symptoms were the multiple strictures in the small bowel and not the stricture located at the ileocolonic anastomosis. This is a position the doctor was entitled to maintain. He was not obligated to admit negligence if he believed otherwise. These denials cannot serve as a basis of a sanctions order.

### 2. Medical Judgment is Not an Affirmative Defense.

The trial court concluded "medical judgment" was an affirmative defense that the defendants waived by failing to plead it in their answer. Here too, the trial court erred.

---

person or tribunal." The majority of the Committee feels that a fraud has been perpetrated upon the court and the opposing party by such perjury in a deposition and that further fraud would be perpetrated by permitting use in litigation of the perjured deposition, such as the one referred to in the inquiry, or by later testimony in like fashion before the court if the deposition itself should be used in evidence.

Fla. Bar Pro. Ethics Comm'n., Formal Op. 75-19 at *1.

A medical negligence claim is, in essence, a claim that a medical provider failed to properly use medical judgment. *See Rockledge HMA, LLC v. Lawley*, 310 So. 3d 112, 116 (Fla. 5th DCA 2020) (holding plaintiffs' action sounded in medical negligence because plaintiffs "[would] be required to show that Dr. Hill improperly exercised medical judgment"); *see also Gouveia v. Phillips*, 823 So. 2d 215, 218 (Fla. 4th DCA 2002).

Unlike a denial of allegations, an affirmative defense admits the allegations but seeks to avoid liability by operation of a legal excuse which the defendant has the burden of pleading and proving. *See State Farm Mut. Auto. Ins. Co. v. Curran*, 135 So. 3d 1071, 1079 (Fla. 2014). Here, the doctor did not admit negligence, and, therefore, "medical judgment" could not have been an affirmative defense. *See Mancinelli v. Davis*, 217 So. 3d 1034, 1038 (Fla. 4th DCA 2017). The "medical judgment" defense in this case involved a factual dispute, not a legal avoidance of admitted allegations.

In short, the trial court erroneously interpreted the law on "medical judgment".

### 3. *The Monetary Sanction Was Excessive.*

We reverse the sanctions order for two additional reasons. First, the order preventing the doctor and defense experts from discussing "medical judgment", albeit in error, more than ameliorated any perceived prejudice to the plaintiff. *See Perez v. Safepoint Ins. Co.*, 299 So. 3d 1087, 1090–91 (Fla. 3d DCA 2019) (reversing dismissal sanction for fraud on trial court where affidavit allegedly misrepresenting core facts could have been stricken as lesser sanction). And second, the amount awarded was excessive.

The trial court's sanction order precluded the doctor and his experts from using a "medical judgment" defense. As indicated above, the exclusion of the doctor's truthful testimony was improper. *See Fla. Peninsula Ins. Co. v. Newlin*, 273 So. 3d 1172, 1179–80 (Fla. 2d DCA 2019) (Lucas, J., concurring) ("[W]e have never applied *Binger*'s factors as a substantive test for the admissibility of evidence or for motions for new trial; nor have we ever held that *Binger* must be applied beyond the contexts of undisclosed witnesses or undisclosed expert testimony.").

Even so, the limitation on testimony remedied any perceived prejudice. Courts are not empowered to award attorney's fees simply because a movant succeeds in having testimony excluded. "[F]actual inconsistencies, even false statements are well managed through the use

of impeachment and traditional discovery sanctions." *Gilbert v. Eckerd Corp. of Fla., Inc.*, 34 So. 3d 773, 776 (Fla. 4th DCA 2010) (quoting *Ruiz v. City of Orlando*, 859 So. 2d 574, 576 (Fla. 5th DCA 2003)).

We also reverse the sanctions order because of the excessive amount awarded. This is because the award neither directly related to the alleged sanctionable conduct nor reflected a reasonable number of hours expended.

"[T]he amount of the award of attorneys' fees must be directly related to the attorneys' fees and costs that the opposing party has incurred as a result of the specific bad faith conduct of the attorney." *Moakley*, 826 So. 2d at 227. Where the orders and record fail to show how the alleged misconduct directly caused the fees awarded, it must be reversed. *See Hicks v. Hicks*, 284 So. 3d 576, 579 (Fla. 4th DCA 2019).

The $271,487.82 award encompassed three time periods: the time plaintiff and her counsel expended in: (1) the two weeks preparing for trial; (2) the aborted trial time; and (3) time expended in connection with the sanctions motion.

Regarding the pretrial and aborted trial time periods, the trial court specifically concluded that "[b]oth sides must now prepare for another trial which should have already been completed." This is incorrect. Because the plaintiff settled with the doctor, no new trial was required. And even if the case had not settled, plaintiff's counsel would not have had to prepare differently based on the order limiting the defense testimony. The "fraud on the court" sanction motion and evidentiary hearing were unnecessary after the court prohibited the use of the "medical judgment" defense.

And, the $271,487.82 award was based on an unreasonable and excessive amount of hours. *See Hoegh v. Estate of Johnson,* 985 So. 2d 1185, 1186–87 (Fla. 5th DCA 2008). The trial court based its award on 867.60 hours divided between plaintiff's three attorneys, law clerks, paralegals, and the fee expert. The hours submitted by plaintiff's counsel were insufficiently detailed and contained improper "block billing" and duplicative time. *See Moore v. Kelso-Moore*, 152 So. 3d 681, 682 (Fla. 4th DCA 2014). In fact, one attorney submitted an amended affidavit reducing excessive hours in an alleged effort to be "decent." We conclude the hours and fee award were excessive.

As Judge Carnes stated in *Norelus*, "[n]o one's memory is perfect. People forget things or get confused, and anyone can make an innocent

19

misstatement or two." 628 F.3d at 1273.  This is just one of those cases.  But it was not a case of bad faith or litigation misconduct on the part of defense counsel.  For the foregoing reasons we reverse the sanctions order.

*Reversed and remanded.*

CIKLIN and LEVINE, JJ., concur.

*          *          *

**Not final until disposition of timely filed motion for rehearing.**